CHARLES D. MATTESON, Administrator, v. WILLAM H. DENT, Receiver, Appellant.

|112  551|
|116  379|

Pledges with Notice:    PLEDGE BY CREDITOR:    Rights of owner.
Where a debtor pledges bonds to his creditor to secure certain
1   indebtedness under a contract which authorizes the creditor
to repledge the bonds for the purpose of floating the secured
2   notes or renewals thereof, and the creditor pledges the bonds
for his own benefit, the debtor, on paying the secured notes,
may recover the bonds from the second pledgee, since such
pledgee is chargeable with notice of the limitation on the
creditor's authority.

Voluntary Payment:    SUBROGATION.    Where a stranger who is under no legal obligation to pay a note, does so at the request of an endorser thereon, but without the request of the maker,
3   and the indorser afterwards fraudulently procures possession of the note, and collects the amount due from the maker, the stranger will not be subrogated to the rights of the original payee, he being a mere volunteer.

Appeal from Winneshiek District Court.—HONS. L. E. FELLOWS and A. N. HOBSON, Judges.

SATURDAY, DECEMBER 22, 1900.

PLAINTIFF is administrator in this state of the estate of one L. W. Matteson, deceased, late of St. Paul, Minn.,

and defendant is receiver of the First National Bank of Decorah. This action was in replevin to recover possession of 16 bonds of the Iowa & Minnesota Investment Company, each of said bonds being of the face value of $500. There was a denial of plaintiff's right to recover as to 12 of the bonds, and an equitable defense interposed against his claim to the remaining 4. The law and equity branches of the action were separately tried; the former before Fellows, J., and the latter by Hobson, J. In both actions judgment went in favor of plaintiff, there being a directed verdict on his motion in the law case. Both proceedings are submitted here on one record, defendant being appellant.—*Affirmed.*

*Dan Shea* for appellant.

*H. T. & C. W. Reed* for appellee.

WATERMAN, J.—S. W. Matteson, James H. Easton, who was president of the First National Bank of Decorah up to the time of its going into the receiver's hands, and certain associates, jointly purchased a tract of land near the city of Duluth, Minn., known as "Longview Addition" to that city. For a part of the purchase price said Matteson made his note to Easton for the aggregate amount of $37,600. Later the persons so interested in this real estate, incorporated as the Iowa & Minnesota Investment Company, and the real estate was conveyed to such company, which paid therefor by issuing $60,000 of its bonds, secured by a trust deed on the land. The capital stock of the investment company was $100,000. Matteson and Easton each had a one-fourth interest in said investment company, and so were entitled each to $25,000 of the stock and $15,000 of its bonds. Thirteen thousand dollars of the bonds allotted to Matteson were issued and transferred to Easton, the remainder being held by the company as part of a reserve. After these transactions, and on May 15, 1894, Matteson and Easton entered into an agreement in writing, which, after reciting the original indebtedness of the former to the latter

of $37,600 on account of the purchase of said land, and for which Matteson's notes were outstanding, concludes as follows:

"Now, this memorandum witnesseth that there has been a full and complete settlement and accounting of all the dealings between said Matteson and said Easton on account of the purchase and sale of aforesaid Longview addition to the Iowa and Minnesota Investment Company of Decorah, Iowa, and that there is now due the said Easton from the said Matteson the said sum of sixteen thousand six hundred and ten and 75-100 ($16,610.75) dollars, as aforesaid, which said S. W. Matteson hereby promises and agrees to pay to the said Easton, with eight (8) per cent. semi-annual interest both before and after due and until fully paid; for the security of the payment of which the said Matteson has duly transferred to said Easton thirteen thousand ($13,000) dollars in the 5-10 bonds of said investment company, and twenty-five thousand ($25,000) dollars in the stockholders' shares of said investment company, which he, the said Easton, is hereby duly authorized to rehypothecate for the purpose of floating the notes of said Matteson, herein scheduled, and any renewals thereof. Now, therefore, it is hereby agreed and understood that said Matteson's indebtedness to said Easton is expressed in the within schedule and described notes, and that he shall pay his pro rata share of the same at his own cost and expense, as they become due, in the proportion which sixteen thousand six hundred ten and 75-100 ($16,610.75) dollars bears to the aforesaid sum of thirty-seven thousand six hundred ($37,600) dollars, and that said Easton shall pay and discharge the remainder thereof at his own costs and expense, and that this agreement shall be equally applicable to any renewals or extensions of the time for payment of the notes herein listed; but, if said Matteson shall fail to pay his notes as they become due, as aforesaid, and the said Easton shall pay and discharge, or cause them to be paid, on account of his liability thereon as

indorser or otherwise, then the said Matteson will forthwith reimburse said Easton, and he (the said Matteson) hereby promises and agrees with said Easton to fully reimburse him, and to pay him the amount which may be found on accounting to be justly due said Easton, in accordance with the foregoing contract and agreement. On full payment of all of the indebtedness to said Easton as hereinbefore stated, to-wit, 'sixteen thousand six hundred ten and 75-100 ($16,-610.75) dollars, and eight (8) per cent. semi-annual interest, as due said Easton, with interest as aforesaid, the said Easton shall return the aforesaid stocks and bonds deposited with him as collateral security by said Matteson, as also all notes herein mentioned, duly canceled, and any renewals thereof.

"Schedule of notes executed by S. W. Matteson, by whom held, date, when due, rate of interest which same bear, referred to in the foregoing agreement:

| BY WHOM HELD. | AMOUNT. | DATE. | DUE. | INTEREST. |
|---|---|---|---|---|
| (1) Second National Bank, Freeport, Ill... | $ 2,000 | May 15, 1894. | Nov. 15, 1894. | 7 per cent. |
| (2) Second National Bank, Freeport, Ill.. | 2,000 | May 15, 1894. | Jan. 15, 1895. | 7 per cent. |
| (3) First National Bank, Decorah, Iowa.. .......... | 3,000 | Jan. 11, 1894. | July 11, 1894. | 8 per cent. |
| (4) First National Bank, New Hampton, Iowa .. | 2,000 | May 15, 1894. | Nov. 15, 1894. | 7 per cent. |
| (5) First National Bank, New Hampton, Iowa... | 3,000 | May 15, 1894. | Jan. 15, 1894. | 7 per cent. |
| (6) First National Bank, Decorah, Iowa ............... | 3,500 | Feb. 20, 1894. | June 20, 1894. | 8 per cent. |
| (7) F. S. Easton, Lowville, N. Y....... ............ | 2,500 | Feb. 27, 1894. | June 27, 1894. | 8 per cent. |
| (8) F. S. Easton, Lowville, N. Y.. .... ......... | 2,500 | Feb. 27, 1894. | June 27, 1894. | 8 per cent. |
| (9) First National Bank, Monroe, Wis ..... .......... | 5,000 | Mch. 22, 1894. | Sept. 22, 1894. | 8 per cent. |
| (10) First National Bank, Monroe, Wis.............. .... | 5,000 | Mch. 22, 1894. | Sept 22, 1894. | 8 per cent. |
| (11) Winneshiek Co B k. Decorah, Iowa.. . .... | 1,800 | Mch. 27, 1894. | Sept. 27, 1894. | 8 per cent. |
| (12) First National Bank, Decorah, Iowa.............. | 3,500 | Mch. 24, 1894. | Aug. 24, 1894. | 8 per cent. |
| (13) First National Bank. Decorah, Iowa. .............. | 1,800 | Mch. 27, 1894. | Sept. 27, 1894. | 8 per cent. |
| Total ........... ............ | $ 37,600 | | | |

"In testimony whereof, witness the hand and seal of the parties hereto on this eighteenth day of May, A. D. 1894, intending mutually to bind our heirs, executors, administrators, and assigns to all of the foregoing agreements. James H. Easton. [Seal.]  S. W. Matteson. [Seal.]"

For convenience we have affixed numbers to the different notes scheduled. It will be observed by this agreement, which is not in any way disputed here, the amount of Matteson's indebtedness is fixed at $16,610.75, and the remainder of the $37,600 was assumed by Easton; that Matteson transferred to Easton $13.000 in bonds and $25,000 in stock to secure the former's notes for the amount of the indebtedness which he was to pay. The agreement gives Easton a right to re-hypothecate the securities. This, however, by any rule of construction, must be held to mean that he had a right to pledge them to secure renewals of Matteson's notes, and not that he had authority to divert and use them in securing any other debts than Matteson's proportion of the principal sum mentioned in the article of agreement. With the consent of both parties to this agreement, the particular items of the Matteson indebtedness were specified, and the collaterals pledged as follows: The bonds: $5,000 to F. S. Easton (Nos. 7 and 8 of schedule). These are not involved in this action. $3,000 to Second National Bank of Freeport, Ill. (Nos. 1 and 2 of schedule.) $2,000 to First National Bank of New Hampton (No. 4 of schedule). $3,000 to same bank (No. 5 of schedule). The Matteson bonds, as delivered, were numbered, respectively, 25, 64, 70, 71, 76, 77, 85, 86, 92, 93, 98, 99, 102, 103, 116, and 117. Of these, Nos. 85, 86, 92, and 93 are involved in the equitable issue; these were deposited to secure payment of the $2,000 note to the New Hampton bank (No. 4 of schedule), and need not be further considered at this time, for we shall follow the order of counsel's argument, and dispose of the law branch of the case first. The shares of stock were deposited with the First Na-

tional Bank of Decorah to secure the amount of the balance of Matteson's debt, which was $3,610.75.

We now turn to the record to see what has been done with the indebtedness of Matteson, for which this collateral was pledged. First as to Nos. 1 and 2, being notes to the Freeport bank. The note due November 15, 1894 (No. 1), was paid by Matteson, canceled, and returned to him, at its maturity. This fact is undisputed. The other note held by this bank was renewed. So, also, was the $3,000 note to the New Hampton bank. This last renewal was made by giving two notes for $1,000 and $2,000 respectively. Each of these three renewal notes was paid by the Matteson estate, and the administrator was given the canceled paper, which is produced on this trial. This disposes of all the notes save the $2,000 one to the New Hampton bank, which is involved in the equitable branch of the case. These notes seem to have been paid through the Decorah bank, and the collateral bonds were returned to it, and thus came into the hands of Easton. When the bank went into the hands of a receiver, there was nothing on its books to show that it held any of the bonds in dispute as security for the payment of any debt due it. The larger part of Matteson's indebtedness to this bank is, under his agreement with Easton, assumed by the latter. Turning now to some familiar principles of law, it may be said that one dealing with a special agent is bound to take notice of the extent of his authority. *Roberts v. Rumley,* 58 Iowa, 301. Where power is given an agent to do a particular act, general words in the writing conferring such power must be limited to such act. *Roberts v. Rumley, supra; Weare v. Williams,* 85 Iowa, 253, 263. We have, then, this state of facts: The parties to the agreement, which we have set out, identified the particular items of indebtedness which Matteson was to pay, and the particular security which was to be given therefor. These securities were given. Any right of rehypothecation which was had by Easton was necessarily

limited to repledging only for a renewal of some of these
particular debts. As either of these debts was paid, and the
collateral released, such securities became at once the prop-
erty of Matteson, and Easton had no further authority to
in any way use or dispose of them. This finding sustains
the order of the trial court in taking the case from the jury.
It is not out of place, however, for us to add in this con-
nection that there is grave doubt whether there is any sub-
stantial evidence of a pledge of these securities to the De-
corah bank.

The equitable issue: Bonds Nos. 85, 86, 92, and 93
were, as already stated, deposited as collateral to secure the
payment of a $2,000 note owned by the New Hampton bank.
It is claimed by defendant that at the request of Easton,
who was an indorser on said note, the same was paid
by the First National Bank of Decorah; that after
its payment, Easton wrongfully obtained possession
of the same, and surrended it to plaintiff. Defendant there-
fore prays to be subrogated to the rights of the New Hamp-
ton bank. It is well settled that a stranger or volunteer
who pays a debt for another without being under any legal
obligation to do so, and not at the debtor's request, is not en-
titled to subrogation. Sheldon Subrogation, section 240:
*Wormer v. Agricultural Works,* 62 Iowa, 699. No claim
is made that Matteson desired the Decorah bank to pay this
debt. Its action was taken, if at all, at the request of Eas-
ton, the indorser of the note. Appellant mistakes the issue
in the case of *Rand v. Barrett,* 66 Iowa, 731. The facts
there were, not that a third party paid the note at the re-
quest of a guarantor, but that the latter paid it at the re-
quest of the maker. But, without discussing the matter fur-
ther, we may say the testimony justifies the finding that Mat-
teson paid the amount of this note to Easton, as shown by
the latter's admission, and the Decorah bank later sent this
or other money to the New Hampton bank, and obtained the
securities. It will be seen from these facts that, if subroga-

tion is now enforced, Matteson will be obliged to twice pay this debt. That equitable doctrine can be invoked to prevent injustice, but never to effect it. On both appeals, AFFIRMED.